**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

In re:

Preston Byron Knapp and
Michelle Nichole Knapp,

Debtors.

Chapter 7

Bankruptcy No. 25-41644

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**
**DISMISSING CHAPTER 7 CASE**

This matter came before the Court for an evidentiary hearing on January 28 and

February 6, 2026, on the Motion to Dismiss Chapter 7 Case filed by Mary R. Jensen,

Acting United States Trustee for Region 12 ("UST").  Colin Kreuziger appeared on

behalf of the UST.  The debtors appeared *pro se*.  Based on the evidence adduced at the

evidentiary hearing, the Court makes the following:

**FINDINGS OF FACT[1]**

1. Mary R. Jensen is the Acting United States Trustee for Region 12 ("UST"),

   which covers the Federal Judicial Districts of Iowa (Northern & Southern

   Districts), Minnesota, North Dakota, and South Dakota.  (Stipulation of Facts,

   ¶ 1.)

2. The debtors,[2] Preston Byron Knapp and Michelle Nichole Knapp, filed a

---

[1] Findings of fact shall be construed as conclusions of law and conclusions of law shall
be construed as findings of fact when appropriate.  *See* Fed. R. Bankr. P. 9014 and 7052.

[2] Mr. Knapp testified at the meeting of creditors that he was not the debtor.  (Ex. 4, at
13:13-20.)  The Court disregards this testimony, as it is obviously false, and the debtors
themselves contradicted their prior testimony at the evidentiary hearing.  (Testimony,

voluntary chapter 7 petition on May 21, 2025.  (*Id.*, at ¶ 2.)

3. Mr. Knapp is thirty-six years of age; he is employed as a merchant by Harbor Freight Tools.  (Audio Recording of Testimony (hereinafter, "Testimony"), #132, at 1:23-1:25; *id.*, at 1:32-1:35.)  Mr. Knapp holds a bachelor's degree in marketing.  (*Id.*, at 1:25-1:30.)  Ms. Knapp is thirty-five years of age; she is a stay-at-home parent, and she holds a bachelor's degree in economics and international studies.  (Testimony, #127, at 12:40-12:56.)

4. The meeting of creditors was scheduled pursuant to 11 U.S.C. § 341(a) for June 27, 2025.  (Stipulation of Facts, at ¶ 3.)  The meeting of creditors was rescheduled for July 3, 2025, and subsequently continued to August 15, 2025, October 15, 2025, November 10, 2025, and November 24, 2025.  (*Id.*, at ¶ 3.)  The debtors appeared and testified at each meeting of creditors.  (*See* Ex. 1-5.)  The meeting of creditors has not been concluded.  (Stipulation of Facts, at ¶ 3.)

5. The UST filed a statement of presumed abuse on July 7, 2025.  (*Id.*, at ¶ 4.)

6. The UST filed the pending motion to dismiss on July 21, 2025.  (#49.)

7. The debtors' debts are primarily consumer debts.  (Stipulation of Facts, at ¶ 5.)

8. At the time of their bankruptcy petition, the debtors had two minor children, and Ms. Knapp was pregnant.  (*Id.*, at ¶ 6.)  The debtors' third child was born in December of 2025.  (*Id.*)

9. The debtors purchased their current homestead on March 19, 2021, for

---

#127, at 12:32-12:36; Testimony, #132, at 01:12-17.)  In addition, Ms. Knapp *also* claimed at the evidentiary hearing that she was *not* the debtor.  (Testimony, #127, at 27:32-52.)

$1,399,250. (*See* Ex. 66, at 1; Testimony, #128, at 15:40-15:55; Testimony, #132, at 03:25-03:29.)  The home is a five bedroom, five bathroom, 6,182 square foot home with a three car garage, located on 1.11 acres on Saunders Lake. (*See* Testimony, #128, at 15:10-15:40; *id.* at 15:58-16:02; *see also* Ex. 66, at 1.) Photographs of the debtors' homestead indicate that the debtors' homestead can only be characterized as a luxurious residence far in excess of a typical homestead in the Twin Cities metropolitan area. (*See* Ex. 66, at 10-33.)  The debtors took out a second mortgage in July of 2021. (Ex. 1, at 30:14-18.)  Ms. Knapp admitted that her family could live in a different home, and that it was not necessary to live in a five bedroom, five bathroom home. (Testimony, #128, at 17:02-17:31).

10. The debtors had not paid their primary mortgage for over a year when they filed their bankruptcy petition. (Ex. 1, at 23:23-24:19.)  Mr. Knapp attempted to deny this fact at trial, *see* Testimony, #132, at 04:54-05:06, but he offered no explanation for his conflicting testimony.

11. The debtors also failed to pay their property taxes for tax years 2022 through 2025. (*See* Ex. 65, at 1.)  At the meeting of creditors, Mr. Knapp acknowledged the unpaid property taxes, *see* Ex. 2, at 25:2-10, but he testified at the evidentiary hearing that they had not failed to pay the property taxes. (*See* Testimony, #132, at 6:17-6:25.)  The debtors' denial appears to be related to the discredited legal theory that Mr. Knapp unsuccessfully pursued, with Ms. Knapp's consent, in a post-petition lawsuit against Hennepin County. (*See* Ex. 12; Ex. 15, at 2-6; Ex. 17; Testimony, #132, at 43:33-44:42.)  Although Mr. Knapp sent his "demand"

to Hennepin County before the debtors filed their bankruptcy petition, the debtors failed to disclose the claim in their original and amended bankruptcy schedules.  (*See* Ex. 18, at 2-11; Ex. 21, at 1-10.)  In fact, the debtors testified falsely at the meeting of creditors that no one owed them any money, Ex. 1, at 41:25-42:3, and Mr. Knapp later testified falsely that he had listed the claim against Hennepin County on the original bankruptcy schedules.  (*See* Ex. 3, at 30:14-34:14.)  Most recently, the debtors falsely stated in their discovery responses that they had "actual property tax expenses" in 2022 through 2025. (*See* Ex. 37, at 13.)

12. The debtors were not paying for any insurance on their homestead when they filed their bankruptcy petition.  (*See* Ex. 1, at 23:7-19.)  Mr. Knapp testified falsely at the evidentiary hearing that the homestead was insured at the time of the bankruptcy petition.  (*See* Testimony, #132, at 03:30-03:39.)

13. The debtors also engaged in multiple frivolous lawsuits before they filed their bankruptcy petition.  On October 18, 2023, Mr. Knapp sued Wings Financial Credit Union ("Wings"), the holder of both mortgages attached to the debtors' homestead.  (*See* Ex. 47; Ex. 18, at 14.)  Ms. Knapp was aware that Mr. Knapp was filing the complaint.  (Testimony, #128, at 04:58-05:48)  The complaint is, on its face, frivolous.  (*See generally* Ex. 47.)  Mr. Knapp only dismissed the complaint after the presiding United States Magistrate Judge entered an order to show cause due to defective service.  (*See* Ex. 48-50.)  Specifically, Mr. Knapp promised to pursue a "second, larger and more comprehensive cause."  (Ex. 49, at 1.)  The District Court dismissed the case on February 9, 2024.  (Ex. 50.)

14. Mr. Knapp proved true to his word; he did later pursue a second, equally frivolous lawsuit against Wings.  (*See generally* Ex. 59.)  Ms. Knapp was aware of Mr. Knapp's complaint, although she claimed to be "not sure" if she agreed with the allegations.  (Testimony, #128, at 11:25-12:05.)  The District Court dismissed the complaint on November 7, 2024, and it enjoined Mr. Knapp "from filing any civil action in this District Court against Wings or any affiliated parties, without first obtaining leave of Court."  (Ex. 59, at 14; *see also* Ex. 60.)  The District Court found that "Plaintiff's claims are meritless and that their assertion is not reasonable.  As discussed above, Plaintiff asserts claims that arise from a conspiracy theory that has been widely rejected by federal courts.  In addition, Plaintiff's statutory claims are frivolous because the cited statutes do not apply to Wings, do not provide a private right of action, and assert claims that have no basis in law or fact.  It is apparent to the Court that Plaintiff is attempting to litigate clearly meritless claims."  (Ex. 59, at 12.)  The District Court also noted that "Plaintiff appointed Brandon Joe Williams . . . as his 'attorney-in-fact' and purportedly granted Williams the power to '[p]erform any act necessary to deposit, negotiate, sell or transfer any note, real estate, security, or draft of the United States of America, including U.S. Treasury Securities.'"  (*Id.*, at 3.)  Mr. Knapp later testified falsely at his meeting of creditors and at the evidentiary hearing that Mr. Williams had no involvement in the federal court lawsuits.  (Ex. 1, at 45:1-6; Testimony, #132, at 18:02-42.)  Mr. Knapp testified at the meeting

of creditors that he had not paid Mr. Williams.[3] (Ex. 1, at 32:6-9.) In fact, the debtors paid Mr. Williams $139,000 in November of 2023. (Ex. 5, at 2:11-24; *id.*, at 5:21-6:24.)

15. Mr. Knapp then appealed the District Court's decision to the Eighth Circuit, which affirmed the District Court on March 18, 2025. (*See* Ex. 61; Ex. 62.) The Eighth Circuit then denied Mr. Knapp's petition for rehearing *en banc* on April 21, 2025. (*See* Ex. 63.) Ms. Knapp was aware of the appeal, but claimed that she did not know if she agreed with the position that Mr. Knapp took on appeal. (Testimony, #128, at 13:40-13:50.)

16. Meanwhile, the debtors filed another frivolous complaint against Compass Minnesota, LLC ("Compass") and Daniel Philip Hollerman. (*See* Ex. 51.) The debtors hired Mr. Hollerman and Compass to sell their current homestead. (*Id.*, at 2.) The debtors also engaged Mr. Williams, who engages in the unauthorized practice of law as "Williams & WILLIAMS Law Group" and pursues sovereign citizen-style arguments. (*Id.* at 4 n.2.) Mr. Williams was intimately involved with the debtors' litigation against Compass and Mr. Hollerman. (*See id.*, at 4-7.) The

---

[3] The full excerpt reads as follows:

    MS. SULLIVAN:   And have you paid Brandon Joe Williams any money in the last year?
    MR. KNAPP:     You'll see there - - have I paid him? No, I have not.
    MS. SULLIVAN:   So you haven't paid him any money whatsoever in the last year?
    MR. KNAPP:     No.

(Ex. 1, at 32:6-12.) The Court finds that this testimony is misleading and gives the impression that Mr. Knapp did not pay any funds to Mr. Williams, either within the previous year or at any other time.

District Court dismissed the complaint on June 4, 2024 and entered judgment against the debtors the next day. (*Id.*, at 25; Ex. 52.) The District Court awarded sanctions against the debtors totaling $64,337.46, and it amended its judgment on August 12, 2024, to reflect the sanctions award. (*See* Ex. 53, at 10; Ex. 54.) The District Court specifically found that "Plaintiffs' claims are rooted in a conspiracy theory concerning the American system of government, which has been roundly rejected by every federal court to consider it and whose proponents continue to burden the dockets of both this Court and its sister courts. . . . Plaintiffs' complaint is baseless in its entirety, either in law or a nonfrivolous argument for modifying existing law or for establishing new law." (*See* Ex. 53, at 7-8.)

17. True to form, the debtors appealed the District Court's judgment to the Eighth Circuit, which similarly affirmed and entered judgment on January 24, 2025. (*See* Ex. 55; Ex. 56.) It also denied the debtors' petition for *en banc* review on February 18, 2025, *see* Ex. 57, and it awarded attorney fees and costs totaling $13,122.72 to Mr. Hollerman on February 19, 2025. (*See* Ex. 58.)

18. The debtors repeatedly made false statements about the size of their family in their bankruptcy documents. For example, the debtors repeatedly claimed on Schedule J that they had three children. (*See* Ex. 18, at 26; Ex. 21, at 25; Ex. 26, at 6; Ex. 27, at 6.) In fact, they had two children on the date of their bankruptcy petition. (*See* Testimony, #127, at 14:10-15:32; *id.*, #132, at 1:45-2:09.) The debtors repeatedly made similar claims on Form 122A-1 and Form 122A-2. (*See* Ex. 19, at 2; Ex. 20, at 2; Ex, 22, at 2; Ex. 23, at 2; Ex. 26, at 10, 13; Ex. 27, at 10, 13; Ex. 29, at 2; Ex. 30, at 2; Ex. 72, at 5.) All of the documents were signed

under penalty of perjury *before* the debtors' third child was born in December of 2025.  (*See* Ex. 18, at 1; Ex. 19, at 3; Ex. 20, at 9; Ex. 21, at 42; Ex. 22, at 3; Ex. 23, at 9; Ex. 26, at 20; Ex. 27, at 20; Ex. 29, at 3; Ex. 30, at 9; Ex. 72, at 12.)  Ms. Knapp also testified that the debtors claimed a household size of five on their bankruptcy documents due to their understanding of federal tax law, specifically the number of children they would have had "in tax year 2025."  (*See* Testimony, #127, at 14:10-15:32.)  Mr. Knapp also claimed that he was unaware that claiming a larger household size would benefit them in their bankruptcy case. (Testimony, #132, at 02:21-02:32.)  These claims are not credible for at least three reasons.  First, the debtors' third child was not yet born, and the debtors were well aware of that fact when they repeatedly provided false information on their bankruptcy documents.  Second, exemptions were eliminated from the Tax Code for tax years 2018 through 2025, *see* Tax Cuts and Jobs Act, Pub. L. 115–97, and that change was made permanent in 2025.  *See* One Big Beautiful Bill Act (P.L. 119-21).  Third, both debtors are clearly sophisticated individuals who thoroughly researched the law, however erroneously, both before and after their bankruptcy petition.  Mr. Knapp, in particular, expounded extensively on his legal theories about federal tax law, *see generally*, Testimony, #132, at 58:35-1:25:46, but Ms. Knapp also specifically testified that she did not have to pay income tax on any of the income that she received in tax years 2022 through 2024 because she was a nonresident alien living in Minnetrista, Minnesota. (Testimony, #127, at 31:16-31:34.)  Although the debtors appear to have drawn numerous unfounded legal conclusions, this does not change the Court's

impression that the debtors made calculated decisions each time they filed a document or gave testimony in this case.

19. The debtors also failed to disclose any tax refunds on their bankruptcy schedules. (*See* Ex. 18, at 8; Ex. 21, at 7. )  The debtors falsely testified at the meeting of creditors that the information in their bankruptcy documents was true and correct.  (Ex. 1, at 4:16-5:7.)  In fact, the debtors later filed tax returns for tax years 2022-2024 and demanded tax refunds totaling over $78,000.  (*See* Ex. 6, at 2-3; Ex. 7, at 2-3; Ex. 8, at 2-3; Ex. 9, at 2-3; Ex. 10, at 2-3; Ex. 11, at 2-3.)  The debtors filed each of their tax returns on Form 1040-NR, which is a tax form used by nonresident aliens.  (*See* Ex. 6, at 2; Ex. 7, at 2; Ex. 8, at 2; Ex. 9, at 2; Ex. 10, at 2; Ex. 11, at 2.)  At the evidentiary hearing, Ms. Knapp testified that she was not a citizen of the United States; Mr. Knapp admitted that he was, but also acknowledged previously testifying that he was not a citizen of the United States. (*See* Testimony, #127, at 27:16-29:28; Testimony, #132, at 13:26-13:44; Ex. 3, at 9:4-15.)  Ms. Knapp acknowledged that she had a "domiciled location Minnetrista, Minnesota", Testimony, #127, at 27:16-29:28, but she also claimed that she was a "non-resident alien." (*See* Testimony, #127, at 30:03-30:10.)  This testimony is obviously false; the debtors presented no evidence that they were not citizens, and they have lived in Minnesota since at least 2021.  The tax returns also contain false information.  The debtors claimed no income in any of tax years 2022 through 2024, despite providing copies of Form W-2 for each year, which shows the debtors earned hundreds of thousands of dollars in wages. (*See* Ex. 6, at 2-4; Ex. 7, at 2-4; Ex. 8, at 2-4; Ex. 9, at 2-4; Ex. 10, at 2-4; Ex. 11,

at 2-4.)  The debtors attempted to explain why they claimed no income, *see* Testimony, #127, at 29:30-31:00; *id.*, #132, at 30:21-32:18, but neither Patti J. Sullivan, the chapter 7 trustee, nor Sara Mattson, the Internal Revenue Service ("IRS") bankruptcy specialist, could discern any reason why the debtors' wages would not be income.  (*See id.*, #129, at 24:15-24:54; *id.*, at 48:00-48:51.)  Ms. Sullivan testified that she could not administer the refunds because she did not understand how the debtors could claim a refund of all of their withholdings if they had wages.  (*Id.*, #129, at 24:15-24:54.)  Similarly, Brandon Scheetz, an employee of Harbor Freight Tools, and Mr. Knapp himself confirmed that he earned wages by performing services for Harbor Freight Tools.  (*See id.*, #129, at 1:04:53-1:09:30; *id.*, #132, at 22:49-24:00.)  Simply stated, the debtors filed fraudulent tax returns with the IRS.  The debtors also failed to file state tax returns for 2022 through 2024, *see id.*, #129, at 23:45-24:11, despite sizeable income in all years, and sizeable state tax withholdings in 2022 and 2023.  (*See* Ex. 6, at 4; Ex. 7, at 4; Ex. 8, at 4; Ex. 9, at 4; Ex. 10, at 4: Ex. 11, at 4-5.)

20. The debtors continued to make misrepresentations about their income and employment in their bankruptcy.  At the evidentiary hearing, the debtors denied earning any income for both tax purposes, and bankruptcy purposes. (Testimony, #127, at 31:16-31:50; Testimony, #132, at 30:21-32:18.)  Similarly, they *amended* both their schedule I and their statement of financial affairs to claim, under penalty of perjury, zero income for 2023 through the present.  (*See* Ex. 31, at 2, 7.)  At the meeting of creditors, Mr. Knapp testified that he was unemployed, Ex. 4, at 10:5-11.  Mr. Scheetz testified that Mr. Knapp is currently

employed by Harbor Freight Tools, and has been since June 28, 2021.  (*See* Testimony, #129, at 1:05:02-1:07:10; *see also* Ex. 43.)

21. The debtors also paid Barnes Law LLP $20,000 on March 14, 2025, to pursue litigation related to a "botched real estate deal."  (Ex. 31, at 13.)  The debtors did not disclose this purported counterclaim on their original bankruptcy schedules, *see* Ex. 18, at 2-11; Ex. 21, at 1-10, and they also failed to disclose it at the meeting of creditors on July 3, 2025.  (*See* Ex. 1, at 41:25-42:3.)

22. The debtors submitted pleadings with fake case citations on at least two separate occasions during their bankruptcy case.  (*See generally* Ex. 28; Ex. 64, at 10:5-11:3.) The Court warned Mr. Knapp in open court about the dangers of relying on artificial intelligence or internet searches to cite cases.  (Ex. 64, at 10:5-11:3.)  The debtors ignored this warning and submitted another pleading with fake case citations.  (*See* Ex. 28.[4])

23. Bethany Sibenaller, a paralegal specialist employed by the Department of Justice, calculated the debtors' income, including Mr. Knapp's annual bonuses, and expenses, and she summarized her analysis by presenting multiple spreadsheets. (*See* Ex. 32; Ex. 38.)  Ms. Sibenaller testified credibly about her substantial experience performing similar calculations.  She also testified in significant detail about the basis for her calculations and provided additional spreadsheets and

---

[4] The UST detailed the false and inaccurate case citations in this document in a prior filing.  *See* Reply, #69, Mem. of Law, at 3-10.  For the sake of brevity, the Court does not repeat the specific false and inaccurate case citations here.  Rather, the Court finds that the UST's prior submission is accurate, and the debtors submitted numerous false case citations.

other data summarizing the basis of her calculations.  (*See* Ex. 33; Ex. 34, Ex. 35; Ex. 36; Ex. 39; Ex. 40; Ex. 41.)  Ms. Sibenaller calculated the debtors' disposable monthly income at $1,799.02 for purposes of the analysis required by Section 707(b)(2) of the Bankruptcy Code.  (*See* Ex. 32, at 2.)  She also calculated the debtors' disposable income at $3,955.35 for purposes of Section 707(b)(3).  (*See* Ex. 38, at 4.)

24. Ms. Sibenaller based her calculation of the debtors' income by examining the debtors' payment advices and other documents establishing Mr. Knapp's current salary, all of which were provided by Harbor Freight Tools.  (*See* Ex. 34; Ex. 40; Ex. 43, at 1.)  For purposes of Section 707(b)(2), Ms. Sibenaller simply divided the annual bonus that Mr. Knapp received in August of 2025 by twelve.  She explained that current monthly income is calculated by considering all income received and attributable to the six-month period preceding the month of the bankruptcy petition.  (*See* Testimony, #130, at 6:45-11:09.)  Mr. Knapp received a bonus of $25,400.00 on August 1, 2025.  (*See* Ex. 34, at 23.)  Mr. Scheetz testified that the bonus was attributable to the prior fiscal year—August 1, 2024 through July 31, 2025—the entire twelve-month period immediately preceding the receipt of the bonus.  (*See* Testimony, #129, at 1:16:25-1:17:09; *id.*, at 1:17:45-1:21:58.)  Given that Mr. Knapp earned the bonus equally over a twelve-month period, including the six months prior to the bankruptcy petition, Ms. Sibenaller calculated Mr. Knapp's monthly bonus amount by dividing the total received by twelve.  (Testimony, #130, at 10:28-11:09.)  Notably, Mr. Knapp falsely testified at his meeting of creditors that:  (1) he does not receive a bonus every year, Ex.

1, at 47:7-10; (2) his bonus was less than $10,000 in 2024, *compare* Ex. 1, at 47:19-22; *id.*, at 50:13-19 *with* Ex. 34, at 22; (3) that he did not receive a bonus in 2022, *compare* Ex. 1, at 48:16-18 *with* Ex. 34, at 20; and (4) that his bonus was paid in the fourth quarter.  (*Compare* Ex. 1, at 50:2-6 *with* Ex. 34, at 20-23.)

25. For purposes of Section 707(b)(3), Ms. Sibenaller calculated Mr. Knapp's income by referencing Mr. Knapp's current salary as stated by his employer.  (*See* Testimony, #130, at 40:34-41:01.)  She calculated his bonus by multiplying his current salary by 15%.  (*See id.*, at 44:12-44:52.)  Mr. Scheetz confirmed that Mr. Knapp received a bonus in 2022, 2023, 2024, and 2025[5], and that the bonus was received in August of each year.  (*See id.*, #129, at 1:17:45-1:21:58; *see also* Ex. 34, at 20-23.)  Mr. Scheetz further testified that Mr. Knapp received his most recent bonus after receiving a performance review score of three out of a possible five, which indicates that Mr. Knapp was "meeting expectations."  (*See* Testimony, #129, 1:13:28-1:14:00; *id.*, at 1:15:57-1:16:25; *see also* Ex. 44, at 16.)  Mr. Scheetz confirmed that, although bonuses are never guaranteed by Harbor Freight Tools, a performance review score of three out of five typically entitles a merchant employee to a 15% bonus.  (*See* Testimony, #129, at 1:14:01-1:14:46.)

26. Ms. Sibenaller used the debtors' most recently filed Forms 122A-1, 122A-2, and schedules I/J[6], to generate comparative spreadsheets of income and expenses.

---

[5] Mr. Scheetz testified that Mr. Knapp did *not* receive a bonus in 2021 because he started in June of 2021.  (*See* Testimony, #129, at 1:21:59-1:22:20.)  As a result, he was not eligible for a bonus that year.  (*See id.*)

[6] The debtors filed amended Form 122A-1, 122A-2, and schedule I on October 27, 2025, *see* Ex. 31, which is more recent than the documents that they filed that are

(*See* Ex. 32; Ex. 38.)  Ms. Sibenaller explained that she used the applicable IRS expenses for a household of four to calculate the debtors' expenses.  (*See* Testimony, #130, at 11:16-18:17; *see also* Ex. 35.)  She also calculated the debtors' additional health care expenses by deducting the IRS standard for medical expenses from the amount that she calculated the debtors incurred in the six-month period preceding the month of their bankruptcy petition.  (*See id.*, at 28:05-33:55; *see also* Ex. 36.)  She calculated the debtors' tax liability based on the standard deduction and a household size of five to account for the birth of the debtors' third child.  (*See* Testimony, #130, at 18:24-28:05; *see also* Ex. 70.)  She also eliminated the debtors' expenses for additional home energy costs at Line 28 from her calculations because the expenses exceeded the applicable IRS standard.  (*See* Testimony, #130, at 34:00-35:27.)  Ms. Sibenaller further eliminated the debtors' education expenses at Line 29 because the debtors provided no documentation for the expenses beyond bald assertions, and because the debtors' children do not attend a public or private school.  (*See id.*, at 35:28-37:02; *see* Testimony, #128, at 2:33-4:51.)  Instead, they are home-schooled by Ms. Knapp.  (*See id.*)

27. On Schedule I/J, Ms. Sibenaller calculated the debtors' tax liability using essentially the same assumptions, except she adjusted the income to coincide with Mr. Knapp's salary and anticipated bonus.  (*See* Testimony, *id.*, at 41:03-

---

contained in Exhibits 54, and 72.  The Court disregards the claims made in Ex. 31 because, as set forth above, the debtors are lying about their income in those filings, and their assertions regarding expenses similarly lack credibility.

43:59; *see also* Ex. 71.)  Ms. Sibenaller also reduced various expenses associated with the debtors' housing costs to the IRS standard.  (*See* Testimony, #130, at 45:01-45:55.)  Ms. Sibenaller increased the debtors' claimed medical expenses based on her calculations, *see id.*, at 45:57-47:22, and she eliminated the debtors' homeschooling expenses because the expenses did not appear to be education expenses.  (*See id.*, at 47:23-48:39.)

28. On cross-examination, the debtors primarily attacked Ms. Sibenaller's assumptions about the debtors' income, but these attacks focused almost entirely on Mr. Knapp's unsupported legal theory that his salary and bonus from Harbor Freight Tools do not constitute income.  In any event, the debtors offered no evidence as to the correct calculation of their income, preferring to rely on their frivolous legal theory.  With respect to their expenses, the debtors offered only their discovery responses, *see* Ex. 37, which are simply unsupported assertions of expenses.  No documents were provided to confirm the debtors' expenses, and as noted above, at least one category of claimed expenses, the debtors' property tax expense, has been unpaid since at least 2022.  (*See id.*, at 13; Ex. 65.)  So the debtors' assertions regarding their expenses are unsupported and lack credibility.

29. Ms. Sibenaller also produced an alternative analysis of monthly disposable income for purposes of Section 707(b)(2) assuming a household size of five.  (*See* Ex. 42.)  This analysis differed from Ms. Sibenaller's other analysis only in that certain of the debtors' expenses were increased due to the larger household size. (*See* Testimony, #130, at 51:04-52:40.)  Using this assumption, Ms. Sibenaller calculated monthly disposable income of $1,424.47.  (*See* Ex. 42, at 2.)

30. In general, the Court finds that the debtors' testimony lacked credibility, focus, and coherence.  The UST repeatedly impeached the debtors' testimony on a variety of points, and both debtors made absurd assertions regarding facts such as their identity as debtors, their residency, their citizenship status, and various other matters.  In contrast, Ms. Sullivan, Ms. Mattson, Mr. Scheetz, and Ms. Sibenaller all testified clearly, consistently, and credibly.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction pursuant to 28 U.S.C. §§ 157(b)(1) & 1334 and Local Rule 1070–1. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A). Venue in this Court is proper pursuant to 28 U.S.C. § 1408.

2. The Court concludes that granting relief to the debtors would be an abuse of chapter 7, that the debtors filed this case in bad faith, and that a filing bar should be imposed on the debtors.

3. The Bankruptcy Code provides:

   After notice and a hearing, the court, on its own motion or on a motion by the United States trustee . . . may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts . . . if it finds that the granting of relief would be an abuse of the provisions of this chapter.

   11 U.S.C. § 707(b)(1).

4. The debtors are individuals, and they stipulated that their debts are primarily consumer debts.  Thus, the provisions of Section 707(b)(1), including Section 707(b)(2)-(3), apply to the debtors.

5. The Code directs the Court to presume that a debtor's chapter 7 filing is abusive "if the debtor's current monthly income reduced by amounts determined under

clauses (i), (ii), (iii), and (iv) [of § 707(b)(2)(A)], and multiplied by 60 is not less than the lesser of—(I) 25 percent of the debtor's nonpriority unsecured claims in the case, or $9,075, whichever is greater; or (II) $17,150." 11 U.S.C. § 707(b)(2)(A)(I). Stated differently, if the debtor has monthly disposable income of more than $285.83, or $17,150.00 to fund a sixty-month plan, the filing is presumed abusive.

6. Here, the presumption of abuse under Section 707(b)(2) arises. The Court credits Ms. Sibenaller's testimony and her calculations, and concludes that the debtors' monthly disposable income totals $1,799.02. The Court details its rationale in the subsequent paragraphs.

7. Ms. Sibenaller correctly calculated the debtors' current monthly income. Section 101(10A) of the Bankruptcy Code defines "current monthly income" as "the average monthly income from all sources that the debtor receives . . . without regard to whether such income is taxable income, derived during the 6-month period ending on—(i) the last day of the calendar month immediately preceding the date of the commencement of the case . . . ." In this case, the current monthly income encompasses all income received that is attributable to the six month period spanning November 1, 2024 through April 30, 2025. The debtors' income can be split into two parts: (1) Mr. Knapp's salary; and (2) Mr. Knapp's bonus. Ms. Sibenaller correctly calculated Mr. Knapp's salary by examining his payment advices for the applicable six-month period. She also correctly calculated the amount of Mr. Knapp's bonus to be included in the calculation of current monthly income. The evidence showed that Mr. Knapp received the

bonus post-petition, but he earned half of his annual bonus between November 1, 2024 and April 30, 2025. The timing of the receipt of the bonus is immaterial; all that matters is the eventual receipt of the income. *See In re Robrock*, 430 B.R. 197, 204 (Bankr. D. Minn. 2010) ("The statutory concept is logically understood as 'income that resulted from employment during the relevant six month period even though the Debtor received the actual paycheck for that work after the end of the six month period.'" (quoting *In re Bernard*, 397 B.R. 605, 607 (Bankr. D. Mass. 2008))). The debtors' arguments that they do not have income based on their reading of the Tax Code are frivolous. First, both Mr. Knapp and Mr. Scheetz testified that Harbor Freight Tools pays Mr. Knapp for his services. This falls squarely within the Tax Code's definition of "gross income." *See* 26 U.S.C. § 61(a)(1) (defining gross income as "all income from whatever source derived, including (but not limited to) the following items: (1) Compensation for services, including fees, commissions, fringe benefits, and similar items"). Second, the Bankruptcy Code defines current monthly income as all income from any source, regardless of whether the income is taxable income. So even if the debtors' argument that they do not have taxable income was somehow correct (which it is not—*see* 26 U.S.C. § 63(a)), that does not matter under the Bankruptcy Code. The Court also rejects the debtors' argument that Mr. Knapp's bonus could somehow be allocated to some other portion of the twelve-month period outside of the six months prior to the month of the petition. Mr. Scheetz's testimony was clear: Mr. Knapp earned his bonus over the course of an entire year; one-half of that bonus necessarily was earned during

the relevant six-month period. The debtors' arguments to the contrary are unsupported by the evidence.

8. Ms. Sibenaller's adjustments to the debtors' expenses were also well taken. When the debtors filed this case, their household consisted of themselves and their two dependent children. Section 707(b)(2)(A)(i) permits the debtor to deduct the debtor's "monthly expense amounts" as "specified under the National Standards and Local Standards . . . for the debtor, the dependents of the debtor, and the spouse of the debtor in a joint case, if the spouse is not otherwise a dependent." The debtors had two dependents when they filed their bankruptcy petition. The Court is unaware of any authority to support the debtors' argument that their unborn child is a member of their household for purposes of Section 707(b)(2)(A). *See In re Pampas*, 369 B.R. 290, 294 (Bankr. M.D. La. 2007) (holding that the debtor "may not count her unborn child as a member of her household for purposes of the mean [sic] test because, as of the date the U.S. Trustee moved to dismiss her case, her child had not been born"); *see also In re Fleishman*, 372 B.R. 64 (Bankr. D. Or. 2007) (holding that debtors could not claim their unborn child as a member of their household for purposes of determining the debtors' household size under Section 1325(b)(4)). Ms. Sibenaller properly calculated the debtors' expenses on Lines 6, 7, 8, and 22[7] by utilizing the IRS

---

[7] Ms. Sibenaller's calculations did not directly challenge the debtors' assertions of their additional health care expenses on line 22. Instead, she simply deducted $336 (the applicable IRS standard amount for out-of-pocket health care expenses for a household of four) from the average monthly health care expenses asserted by the debtors. Notably, the debtors failed to document any of these claimed expenses.

standards for a household size of four.

9.  The Court also adopts Ms. Sibenaller's tax calculations.  Section 707(b)(2)(A)(i)

permits the debtor to deduct the debtor's "actual monthly expenses for the

categories specified as Other Necessary Expenses issued by the Internal Revenue

Service for the area in which the debtor resides, as in effect on the date of the

order for relief."  The Internal Revenue Manual specifies that "current year

taxes" fall under the category of other necessary expenses.  *See* Internal Revenue

Manual, §§ 5.15.1.11(3), https://www.irs.gov/irm/part5/irm_05-015-

001#idm139862107586064 (last visited on February 25, 2026).  Thus, the

appropriate amount to deduct for tax liabilities on Form 122A-2 is the actual

amount of tax liability, not the amount that debtors choose to withhold from

their paycheck.  *See, e.g., In re Robrock*, 430 B.R. 197, 208 (Bankr. D. Minn. 2010)

(rejecting debtor's argument that amounts withheld from paychecks should be

used to calculate debtor's tax liability in lieu of actual average monthly tax

liability).  Notably, Ms. Sibenaller calculated the maximum possible tax liability

for the debtors by assuming the standard deduction and three child tax credits.

The debtors' challenge to Ms. Sibenaller's calculations fails for two reasons.

First, the debtors themselves calculated monthly tax liability of $3,800 per month

before they began frivolously asserting that they had no income.  Those

statements were made under penalty of perjury, and the Court takes them as

judicial admissions.  In any event, Ms. Sibenaller's calculations actually *increase* the

tax liability that the debtors originally claimed.  Second, the debtors presented no

evidence of what the proper calculation of their tax liability should be, so the

only meaningful evidence before the Court is Ms. Sibenaller's calculations.

10. The Court also agrees with Ms. Sibenaller's elimination of the expenses on Line 28 (Additional Home Energy Costs). Section 707(b)(2)(A)(V) states that the debtor's monthly expenses "may include an allowance for housing and utilities, in excess of the allowance specified by the Local Standards for housing an utilities issued by the Internal Revenue Service, based on the actual expenses for home energy costs if the debtor provides documentation of such actual expenses and demonstrates that such actual expenses are reasonable and necessary." Here, the applicable IRS standards allow the debtors to deduct $855.00 for housing and utility expenses. Ms. Sibenaller did not credit the debtors with additional home energy costs because: (1) the debtors provided no documentation of their expenses beyond a bald statement of such expenses; and (2) to the extent that the expenses exceed the applicable standard, they are not reasonable and necessary expenses. The Court agrees with both reasons, and either is sufficient to deny the claimed expense. The debtors failed to produce any documents, such as utility bills, to verify their claimed expenses. The debtors argued that the UST failed to request additional documentation, but the UST does not have the burden to produce such documentation. The statute requires the debtors to produce such documentation. Even so, the UST specifically requested "documents supporting Form 122A-1 and 122A-2 expenses," *see* Ex. 37, at 5, and the debtors did not produce any utility bills. But even if they had produced such documentation, the Court would still find that their expenses are unreasonable and unnecessary. The debtors live in a five bedroom, five

bathroom home that is over 6,000 square feet.  A home that size dwarfs an average home, and it necessitates unreasonably large home energy costs. Contrary to the debtors' claims, they do not need a home that size for their family.  Most families in the Twin Cities metro area reside in much smaller homes.

11. Finally, the Court agrees with Ms. Sibenaller's elimination of the expenses on Line 29 (Education expenses).  Section 707(b)(2)(A)(IV) states that the "debtor's monthly expenses may include the actual expenses for each dependent child less than 18 years of age, not to exceed $2,575 per year per child, to attend a private or public elementary or secondary school if the debtor provides documentation of such expenses and a detailed explanation of why such expenses are reasonable and necessary, and such expenses are not already accounted for in the National Standards, Local Standards, or Necessary Expenses referred to in subclause (I)." Ms. Sibenaller eliminated the debtors' claimed expenses in this category because: (1) like the claimed home energy costs, the debtors provided no documentation of their expenses beyond a bald statement of such expenses; and (2) the debtors' children do not attend a public, private, or secondary school; they are homeschooled.  The Court agrees with both reasons.  The debtors provided no meaningful documentation for the claimed expenses.  As noted above, the UST, although under no obligation to do so, requested the documentation from the debtors, and they failed to produce the documents.  The record is also clear that the debtors' children do not attend a school; they are homeschooled.  The debtors are certainly free to make that decision, but the statute does not allow

them to deduct expenses associated with that decision. The Court adds a third reason to deny the claimed expense: the debtors also produced no detailed explanation as to why the claimed expenses were reasonable and necessary. On the contrary, it appears that the expenses consisted of various extracurricular activities, such as private music and sailing lessons that are not reasonable and necessary expenses for children who have not yet reached the first grade.

12. Even if the Court agreed that the debtors should be credited with a household of five due to their unborn child, that conclusion would not affect the outcome. Ms. Sibenaller also prepared a second calculation, *see* Ex. 42, that accounted for this possibility. Ms. Sibenaller testified that the only difference between her original calculations and the second set was the additional expenses associated with the increased household size. That resulted in disposable income of $1,424.47. That figure far exceeds the statutory threshold.

13. The UST timely filed the motion to dismiss under Section 707(b)(2). A motion brought under Section 707(b)(2) must be filed within 30 days of the statement required under Section 704(b)(1)(A). *Id.* § 704(b)(2). The statement under Section 704(b)(1)(A) must be filed within ten days of the first date set for the meeting of creditors. *Id.* § 704(b)(1)(A). The UST filed the required statement under Section 704(b)(1)(A) on July 7, 2025, which is ten days after the date set for the meeting of creditors, June 27, 2025. The UST then filed the motion to dismiss on July 21, 2025, which is less than thirty days after the filing of the required statement. *See id.* § 704(b)(2).

14. The debtors failed to rebut the presumption of abuse. Section 707(b)(2)(B)

allows debtors to rebut the presumption of abuse.  But rebuttal is limited to a demonstration of "special circumstances, such as a serious medical condition or a call or order to active duty in the Armed Forces, to the extent such special circumstances that justify additional expenses or adjustments of current monthly income for which there is no reasonable alternative." 11 U.S.C. § 707(b)(2)(B)(i). And the case law indicates that "'rebutting the presumption of abuse requires circumstances that are truly special. . . .  Although this presumption may be rebutted, § 707(b) goes on to set this bar extremely high, placing it effectively off limits for most debtors.'" *In re Rieck*, 427 B.R. 141, 146 (Bankr. D. Minn. 2010) (quoting *In re Samson*, No. BK08-80615-TJM, 2008 WL 2949259, at *2 (Bankr. D. Neb. July 28, 2008)); *see also In re Robrock*, 430 B.R. 197, 211 (Bankr. D. Minn. 2010) (citing *In re Rieck* with approval); *In re Rudnik*, 435 B.R. 613 (Bankr. D. Minn. 2010).  Any special circumstances "'should rise to the same level as [the statutorily recognized examples of] a serious medical condition or a call to active duty.'" *Rieck*, 427 B.R. at 146 (quoting *In re Delunas*, No. 06-43133-705, 2007 WL 737763, at *2 (Bankr. W.D. Mo. Mar. 6, 2007)).  In addition, "[i]n order to make a finding of special circumstances, the Court must be able to conclude that 'the Debtors have no reasonable alternative.'" *Id.* (quoting *In re Wagner*, No. BK07-42262, 2008 WL 706616, at *3 (Bankr. D. Neb. 2008)).

15. The Code also requires the debtor to comply with certain procedures to rebut the presumption by invocation of special circumstances.  *See* 11 U.S.C. § 707(b)(2)(B)(ii)-(iii). Specifically, the debtors must "itemize each additional expense or adjustment of income and . . . provide—(I) documentation for such

expense or adjustment to income; and (II) a detailed explanation of the special circumstances that make such expenses or adjustment to income necessary and reasonable." *Id.* § 707(b)(2)(B)(ii). In addition, the Code requires the debtors to "attest under oath to the accuracy of any information provided to demonstrate that additional expenses or adjustments to income are required." *Id.* § 707(b)(2)(B)(iii). Finally, the presumption of abuse may be rebutted only: "if the additional expenses or adjustments to income referred to in clause (i) cause the product of the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv) of subparagraph (A) when multiplied by 60 to be less than the lesser of—25 percent of the debtor's nonpriority unsecured claims, or $8,175, whichever is greater; or $17,150.00." *Id.* § 707(b)(2)(B)(iv). In other words, to rebut the presumption of abuse, the adjustments to income or additional expenses must reduce disposable income below the statutory threshold that triggers the presumption of abuse in the first instance. Here, that threshold is $285.83 per month.

16. The debtors did not identify any special circumstances to rebut the presumption of abuse. The Court does not believe that the birth of a child is a special circumstance as contemplated by the statute. But even if it was, the debtors failed to demonstrate that those circumstances would result in additional expenses that rebut the presumption. Ms. Sibenaller's calculations demonstrated that the additional expenses associated with the debtors' third child would not rebut the presumption. Regardless, the debtors made no effort to itemize additional expenses, document the expenses, or provided a detailed explanation

as to why additional expenses were necessary and reasonable.  The Code imposes a high bar, and the debtors did not come close to clearing it.

17. Thus, the Court concludes that the debtors' case is an abuse, and the Code requires dismissal or conversion (with the debtors' consent).  *See* Section 707(b)(2).  The UST timely filed the motion to dismiss under Section 707(b)(3).  A motion brought under Section 707(b)(3) must be brought within sixty days of the first date set for the meeting of creditors.  *Id.* § 1017(e)(2).  Here, the UST filed the motion to dismiss on July 21, 2025, which is less than sixty days after the first date set for the meeting of creditors (June 27, 2025).

18. Section 707(b)(3) requires the Court to consider "(A) whether the debtor filed the petition in bad faith; or (B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse."  The Court considers the totality of the circumstances of the debtors' financial situation first.

19. The structure of 11 U.S.C. § 707(b) suggests that a debtor's ability to pay, standing alone, may constitute abuse.  The presumption of abuse that may arise under § 707(b)(2), bad faith, and totality of the circumstances do not appear to be the only bases for a finding of abuse.  Instead, the Code simply requires the Court to apply a presumption under certain circumstances (§ 707(b)(2)), and to *consider* bad faith and the totality of the circumstances to determine whether granting relief constitutes abuse (§ 707(b)(3)).  The enumeration of these three bases for a finding of abuse does not preclude a finding of abuse premised on an

ability to pay calculated independent of the means test. If Congress intended to limit the bases for a finding of abuse to the presumption under § 707(b)(2), bad faith, or the totality of the circumstances, it could have simply stated that intent. Instead, it chose to create a presumption, and it directed bankruptcy courts to consider two particular factors in determining whether abuse exists in a particular case when the presumption does not arise. The statute does not preclude a court from finding abuse based on something other than the three enumerated bases in §§ 707(b)(2) and (3).

20. Following the passage of BAPCPA, circuit courts agree that ability to pay is a primary consideration when analyzing a motion to dismiss premised on 11 U.S.C. § 707(b)(3)(B). *See Morse v. Rudler (In re Rudler)*, 576 F.3d 37, 51 (1st Cir. 2009) ("If a review of all of a debtor's bankruptcy documents shows that the means test is too generous, a finding of abuse may be appropriate under that subsection [§ 707(b)(3)(B)]."); *Ross-Tousey v. U.S. Trustee (In re Ross-Tousey)*, 549 F.3d 1148, 1161-62 (7th Cir. 2008) ("The UST can still request dismissal, as he has done in this case, under section 707(b)(3), either for bad faith or based on the totality of circumstances (which can take into consideration a debtor's actual income and expenses)."); *see also Frederickson v. Coop (In re Frederickson)*, 545 F.3d 652, 653 (8th Cir. 2008) (stating that "a debtor's 'disposable income' calculation on Form 22C is a starting point for determining the debtor's 'projected disposable income,' but . . . the final calculation can take into consideration changes that have occurred in the debtor's financial circumstances as well as the debtor's actual income and expenses as reported on Schedules I and J").

21. Bankruptcy courts within the Eighth Circuit also agree that ability to pay is a primary consideration under the totality of circumstances of financial situation analysis. *See, e.g., In re Honkomp*, 416 B.R. 647, 649 (Bankr. N.D. Iowa) ("When considering the § 707(b)(3)(B) totality of the circumstances, 'the Court should consider primarily, if not exclusively, the Debtors' ability to pay.'" (quoting *In re Booker*, 399 B.R. 662, 667 (Bankr. W.D. Mo. 2009))); *In re Hicks*, 370 B.R. 919, 923 n.8 (Bankr. E.D. Mo. 2007) (finding that debtor's ability to pay supported a finding of abuse premised upon totality of the circumstances analysis). And a majority of bankruptcy courts nationwide agree that ability to pay is a primary consideration under the "totality of circumstances" analysis. *See In re Booker*, 399 B.R. 662, 666 (Bankr. W.D. Mo. 2009) (collecting cases and agreeing with majority that "believes . . . consideration of the debtors' ability to pay is appropriate for several reasons"). In addition, numerous courts have concluded that the ability to pay, standing alone, supports a finding of abuse under the totality of the circumstances analysis. *See, e.g., In re Henebury*, 361 B.R. 595, 604 (Bankr. S.D. Fla. 2007) ("For the reasons stated, the Court concludes that under BAPCPA the ability to pay, standing alone, is sufficient to warrant dismissal of a Chapter 7 case for abuse pursuant to 11 U.S.C. § 707(b)(3)(B)."). *But see In re Nockerts*, 357 B.R. 497, 505-06 (Bankr. E.D. Wis. 2006) (holding that "something other than an ability to pay is required to success on a Motion to Dismiss" under § 707(b)(3)(B)).

22. Ms. Sibenaller's calculations showed disposable income of nearly $4,000 per month. Ms. Sibenaller accurately projected Mr. Knapp's income based on the

available evidence:  namely, his annual salary and a 15% bonus that he has received every year he has been eligible for it.  Again, the debtors' only argument to the contrary appears to be that:  (1) he does not earn income; and (2) the bonus is discretionary.  The first argument is frivolous, as discussed above.  The Court rejects the second argument because Mr. Scheetz testified that an average performance (3 out of 5 or higher) triggers a 15% bonus, and Mr. Knapp has always received a 15% bonus.  So Ms. Sibenaller based her calculation of income on a solid foundation.

23. With respect to the debtors' expenses, the evidence shows that they are clearly unreasonable and unnecessary.  As noted above, the debtors live in a luxurious lake home that is far above the norm for the Twin Cities.  The result of this decision is expenses that far exceed the IRS standards for the same category.  For example, the debtors claimed monthly mortgage, tax, insurance, home maintenance, and utility costs totaling $9,576.40.  That figure is over three times the applicable IRS standard in Hennepin County for a household of five.  If the debtors simply incurred "standard" housing expenses, they would have an additional $6,460.40 in disposable income.  Offsetting their claimed monthly deficit of $2,904.55 results in monthly disposable income of $3,555.85.  Stated differently, if the debtors spend only *twice* the applicable IRS standard on housing and related expenses, they will still have disposable income of $439.85, which exceeds the statutory threshold that Congress set in Section 707(b)(2).  Moreover, the debtors were not paying their insurance when they filed their petition, they had not paid their mortgage in over a year, and they had not paid

their property taxes for four years. These facts alone demonstrate that the debtors have substantial disposable income if they would simply incur reasonable and necessary expenses rather than luxurious expenses. The only other expense that the UST challenged was the debtors' claimed homeschooling expenses. But these expenses are not reasonable and necessary either. Sailing lessons and private music lessons are not part of a standard pre-school or kindergarten curriculum. They are luxuries, not necessities. The debtors have the ability to pay their creditors; they simply prefer to fund their lavish lifestyle instead. For that additional reason, the Bankruptcy Code requires dismissal of this case.

24. The only remaining question is whether the Court should impose a filing bar upon dismissal and, if so, for how long. The Court concludes that a filing bar of two years is warranted given the extensive evidence of the debtors' bad faith. Section 349(a) of the Bankruptcy Code provides that "[u]nless the court, for cause, orders otherwise, the dismissal of a case under this title [does not] prejudice the debtor with regard to the filing of a subsequent petition." 11 U.S.C. § 349(a). It authorizes bankruptcy courts to impose filing bars on debtors, even permanent bars, "if the court, for cause, so orders." *Casse v. Key Bank Nat'l Assn. (In re Casse)*, 198 F.3d 327, 340 (2nd Cir. 1999); *B-3 Properties, LLC v. Lasco*, 517 B.R. 889, 898 (N.D. Ind. 2014) (collecting cases where courts have imposed permanent bar to filing for bankruptcy relief). "A bankruptcy court's finding of bad faith, or an abuse of the bankruptcy process, particularly in the case of serial filers, is generally considered sufficient cause to impose a bar to refiling." *In re Mehlhose*, 469 B.R. 694, 712 (Bankr. E.D. Mich. 2012).

25. The Bankruptcy Code does not define bad faith, and it was not a specific cause to dismiss a chapter 7 case prior to the passage of the Bankruptcy Abuse Prevention and Consumer Protection Act in 2005.  The United States Supreme Court has stated that "where Congress uses terms that have accumulated settled meaning under . . . common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meanings of these terms." *Neder v. United States*, 527 U.S. 1, 21 (1999) (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322 (1992)) (citations omitted).  This Court assumes that the term "bad faith" incorporates its meaning as promulgated by the courts prior to passage of BAPCPA.

26. The Eighth Circuit has characterized bad faith conduct as "extreme misconduct falling outside the purview of more specific Code provisions, such as using bankruptcy as a 'scorched earth' tactic against a diligent creditor, or using bankruptcy as a refuge from another court's jurisdiction."  *Huckfeldt v. Huckfeldt (In re Huckfeldt)*, 39 F.3d 829, 832 (8th Cir. 1994).

27. In a chapter 13 case, the Eighth Circuit stated that, when considering the debtors' good faith under 11 U.S.C. § 1325(a)(3)[8], "[t]he bankruptcy court must look at factors such as whether the debtor has stated his debts and expenses accurately; whether he has made any fraudulent misrepresentation to mislead the bankruptcy court; or whether he has unfairly manipulated the Bankruptcy Code."

---

[8] Section 1325(a)(3) directs the Court to confirm a chapter 13 plan if "the plan has been proposed in good faith and not by any means forbidden by law."

*Educ. Assistance Corp. v. Zellner*, 827 F.2d 1222, 1227 (8th Cir. 1987) (citing *In re*

*Estus*, 695 F.2d 311 (8th Cir. 1982)).

28. The record shows that the debtors acted in bad faith both before and after their

bankruptcy petition.  The debtors filed three separate, frivolous lawsuits against

their creditors, including two against Wings Financial.  They presented

universally rejected legal theories and were rightly sanctioned for their conduct.

The debtors were not content to subject their creditors to frivolous litigation at

the District Court; they continued their campaign of scorched-earth litigation at

the Eighth Circuit.  Meanwhile, they failed to pay their property taxes, mortgage,

and insurance for their luxurious lake home.  The debtors then amplified their

bad faith conduct by filing a bankruptcy petition seeking to discharge, among

other debts, the sanctions imposed because of their own frivolous litigation.

29. The debtors' misconduct continued unabated in their bankruptcy case.  As the

evidence showed, the debtors made numerous false oaths in their bankruptcy

case, including false statements on their bankruptcy documents and at their

meeting of creditors.  Those false statements appear to have been designed to

mislead the Court about the debtors' income and household size to avoid

application of Section 707(b).  They also appear to be part of an ongoing attempt

to engage in tax fraud directed at the United States and Hennepin County.

Specifically, the debtors filed fraudulent federal income tax returns claiming over

$78,000 in tax refunds.  The debtors then attempted to import their frivolous

legal interpretation of "income" from the Tax Code to the Bankruptcy Code.

They maintained at the evidentiary hearing that they have no income, a statement

that is simply false from both a legal and factual perspective. The debtors also continue to manipulate the Bankruptcy Code by claiming a household size of five for purposes of Section 707(b)(2), a position that lacks any factual or legal support. The debtors concealed a cause of action against Hennepin County that appears to be a continuation of a pre-petition attempt to avoid paying property taxes and defraud Hennepin County. Finally, the debtors have made numerous false citations to case law, including after warnings from this Court.

30. Simply put, the debtors filed this bankruptcy to continue their efforts to abuse the legal system for their own benefit. The debtors appear to take the position that they are not required to pay income taxes, property taxes, mortgage obligations, or their creditors. Instead, they would like to manipulate this bankruptcy proceeding to discharge their debts while they continue to live a luxurious lifestyle enjoyed by few people. The Court will not countenance this continued bad faith conduct, and it finds that a filing bar of two years is warranted under the circumstances.

## ORDER

1. The motion to dismiss is granted.

2. This case is dismissed.

3. The debtors shall be barred from filing a bankruptcy petition for a period of two

   years from the date of entry of this Order.


Dated:                                    _____

                                          William J. Fisher
                                          United States Bankruptcy Judge